**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **WANDA SHULER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:16-CV-1515-BH** |
| | § | |
| **NANCY A. BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Consent** |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Pursuant to the consent of the parties and the order of reassignment dated August 12, 2016 (doc. 14), this case has been transferred for the conduct of all further proceedings and the entry of judgment.  Before the Court are *Plaintiff's Brief*, filed December 20, 2016 (doc. 25) and *Defendant's Brief*, filed January 18, 2017 (doc. 26).  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I.  BACKGROUND[1]

### A.  <u>Procedural History</u>

Wanda Shuler (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner)[2] denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act.  (R. at 1-4.)  On June 5, 2013, Plaintiff filed her application for DIB, alleging disability beginning May 8, 2013.  (R. at 122-28.)  Her claim was denied initially and upon reconsideration.  (R. at 57-65, 67-75.)  Plaintiff requested a hearing before

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

[2]  At the time of filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

an administrative law judge (ALJ), and she personally appeared and testified at a hearing on October 14, 2014. (R. at 40-56.) On December 31, 2014, the ALJ issued a decision finding that she was not disabled and denying her claim for benefits. (R. at 9-32.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on January 30, 2015. (R. at 5-8.) The Appeals Council denied her request for review on April 5, 2016, making the ALJ's decision the final decision of the Commissioner. (R. at 1-4.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.    Factual History**

###### 1.    Age, Education, and Work Experience

Plaintiff was born on August 4, 1964, and was 50 years old at the time of the hearing. (R. at 122, 171.) She had a high school education and could speak English fluently. (R. at 28-29.) She had past relevant work experience as a pharmacy clerk/technician. (R. at 29.)

###### 2.    Medical Evidence[3]

On September 18, 2007, Plaintiff presented to Dr. William Jackson, M.D., of the Carrell Clinic, with pain in her hip and back. (R. at 323-32.) She reported severe hip pain beginning in the "last six to seven months" but had not changed her day-to-day activities. (R. at 324.) Dr. Jackson noted that she was "in no obvious distress," had a "good" range of motion, showed some tenderness and discomfort in the left side of her back, and walked with a "slight abductor gait to the right." (R. at 325.) Dr. Jackson ordered X-rays of her cervical spine and lumbar, which showed "mild degenerative facet changes in the lower lumbar spine." (R. at 327-28.) He opined that her pain was due to the mild degenerative changes and "probably secondary to trochanteric bursitis." (R. at 325.)

---

[3] Because neither the ALJ nor the parties discuss the medical records concerning Plaintiff's 2008 cataract surgery, that evidence is not included. (R. at 333-61; docs. 25, 26.)

He prescribed pain medication and instructed her to complete lower back and abdominal flexion exercises. (R. at 325.)

On December 26, 2008, Plaintiff was transported by ambulance to the Presbyterian Hospital of Greenville (Presbyterian) for nausea, vomiting, and weakness. (R. at 262-65.) She had been previously diagnosed with diabetes mellitus and showed signs of hypoglycemia. (R. at 262.) She was in "moderate distress" with no unusual findings on her physical examination or lab test results. (R. at 262-63.) Plaintiff explained that she had been "adjusting her insulin pump and [believed] that she [had] overmedicated herself." (R. at 264.) She received counseling on her diabetes and insulin pump, and she was discharged in stable condition. (R. at 264.)

On January 30, 2009, Plaintiff met with Dr. Jon A. Krumerman, M.D., of the Dallas Neurosurgical and Spine Associates, P.A., for a consultation on her worsening back pain. (R. at 362-81.) Dr. Krumerman noted that Plaintiff walked with a baseline limp with "progressive gait difficulty." (R. at 375.) He ordered an MRI of her cervical spine, which showed a "large extruded disk herniation at C5-6 [that] extend[ed] behind the C6 vertebral body on the left" and a "compressed and displaced cord severely on the left side of the [spinal] canal." (R. at 375, 377-81.) He recommended immediate surgery with a "goal of decompressing the spinal cord." (R. at 376.)

On February 3, 2009, Dr. Krumerman performed an "anterior C6 corpectomy" and a "fusion from C5 to C7" surgery. (R. at 362-73.) Two weeks after the surgery, he noted that the surgery was successful and Plaintiff described "complete resolution" of her preoperative pain. (R. at 373.) Plaintiff returned to Dr. Krumerman four months after the surgery for X-rays and a final follow-up. (R. at 362-70.) He noted that her X-rays "demonstrate[d] complete fusion on flexion-extension views" with no complications. (R. at 362.) He also opined that Plaintiff had "done well since surgery

with resolution of pain and resolved numbing." (R. at 362-63.)

Between June 24, 2011, and May 1, 2013, Plaintiff met with her primary care physician, Dr. Dee McCrary, M.D., every six months for her diabetes management and other healthcare concerns. (R. at 216-44.) Her physical exam results frequently showed no unusual findings except for a limp in her gait. (R. at 223, 227-28, 231, 238.) During her psychiatric assessments, Dr. McCrary consistently noted an "appropriate affect and demeanor; normal speech pattern; [and] normal thought and perception." (R. at 217, 220, 224, 227, 232, 238.)

At her appointment with Dr. McCrary on December 6, 2011, Plaintiff complained of fatigue, guilt, sadness, and feelings of worthlessness. (R. at 236.) She completed a psychological test "administrated by a computer" with test results showing "mild depression" but the "criteria [was] not met" for a DSM-IV diagnosis of depression. (R. at 209, 239.) Dr. McCrary diagnosed her with "depressive disorder not elsewhere classified" and prescribed her an anti-depressant to help with her symptoms. (R. at 239.) During the appointment on July 24, 2012, Dr. McCrary noted that Plaintiff had been "doing well without any significant affective symptoms" of depression, and Plaintiff's test results for depression showed that she was "normal." (R. at 193, 226.)

On June 24, 2013, Dr. McCrary completed a Mental Status Report for Plaintiff. (R. at 247-49.) She opined that Plaintiff showed the following: normal speech pattern; normal perception; an anxious affect; normal thought process and content; and normal insight and judgment. (R. at 247-48.) She noted that Plaintiff's memory and attention/concentration had not been tested. (R. at 248.) Dr. McCrary failed to answer two questions on Plaintiff's "ability to relate to others and sustain work" and "ability to respond to change/stress in work settings." (R. at 249.) She did not identify any limitations due to Plaintiff's depression overall. (R. at 247-49.)

On July 15, 2013, Dr. Mark Schade, Ph.D., a state agency medical consultant (SAMC), completed a Medically Determinable Impairments and Severity form based upon Plaintiff's medical evidence of record. (R. at 60-62.) He opined that Plaintiff had a severe impairment due to diabetes mellitus and a non-severe impairment due to her depressive affective disorder. (R. at 60-61.) He opined that Plaintiff's affective disorder resulted in only mild limitations and that Plaintiff's statements on her symptoms were partially credible because her alleged limitations were only partially supported by the medical evidence. (R. at 61.)

Also on July 15, 2013, Dr. Laurence Lignon, M.D., a SAMC, completed a Residual Functional Capacity (RFC) form based upon Plaintiff's medical evidence of record. (R. at 62-63.) He opined that Plaintiff retained the RFC to perform the following: lift and carry 10 pounds frequently; lift and carry 20 pounds occasionally; sit, stand, and walk for 6 hours each in an 8-hour workday; and an unlimited ability to push/pull. (R. at 62-63.) He did not identify any postural, manipulative, visual, communicative, or environmental limitations. (R. at 63.) He opined that Plaintiff could return to her past relevant work as a pharmacy technician. (R. at 64.)

Beginning April 30, 2014, Plaintiff met with Nurse Keri Huggins Goodwin, RN, FNP-C, at the Live Oak Professional Center on four separate occasions for diabetes management. (R. at 281-322.) Plaintiff explained at her first appointment that the reason for her visit was because she had been "trying to get disability." (R. at 302.) During each examination, Nurse Goodwin noted normal physical findings except for pain in the right hip and normal psychiatric findings with thought process that was "not impaired." (R. at 292-94, 296-97, 303-04.) She diagnosed Plaintiff with "chronic pain" and recommended that she meet with a pain management specialist. (R. at 305.)

On December 5, 2013, Dr. Susan Thompson, M.D., a SAMC, completed a Medically

Determinable Impairments and Severity form upon reconsideration of Plaintiff's application for benefits. (R. at 70-72.) Dr. Thompson agreed with Dr. Schade that Plaintiff had severe diabetes mellitus and non-severe depressive affective disorder. (R. at 71.) She also agreed with Dr. Schade's opinion that her affective disorder resulted in only mild limitations, and that Plaintiff's statements about her symptoms were partially credible because the alleged limitations were only partially supported by the medical evidence. (R. at 71-72.)

Also on December 5, 2013, Dr. Kavitha Reddy, M.D., a SAMC, completed a RFC form upon reconsideration after reviewing the medical evidence of record. (R. at 72-73.) Dr. Reddy opined that Plaintiff retained the RFC to perform the following: lift and carry 25 pounds frequently; lift and carry 50 pounds occasionally; sit, stand, and walk for 6 hours each in an 8-hour workday; and an unlimited ability to push/pull. (R. at 73.) Dr. Reddy did not identify any postural, manipulative, visual, communicative, or environmental limitations. (R. at 73.) She agreed with Dr. Lignon's opinion that Plaintiff could return to her past relevant work as a pharmacy technician. (R. at 74-75.)

On October 2, 2014, Plaintiff was referred by her disability attorney to Dr. Darrell Horton, Ph.D., for a psychological evaluation. (R. at 382-95.) After conducting a clinical interview and a "Million Behavioral Medicine Diagnostic" (MBMD), Dr. Horton diagnosed Plaintiff with depressive disorder with major depressive-like episodes. (R. at 386.) He noted that Plaintiff had coherent speech, normal train of thought, a blunted affect, and a depressed mood. (R. at 383.) He opined that Plaintiff would "not respond favorably to exclusively medical treatment program for her pain-related problems," and that she would likely be "noncompliant with an outpatient treatment plan." (R. at 384.) He further opined that her "mild depressive condition could be treated with cognitive behavioral therapy," and that she would be "likely to be cooperative and responsive to healthcare

recommendations." (R. at 385.) Dr. Horton ultimately opined that her "prognosis for competitive employment [was] poor" because she had functional limitations in the following: understanding and remembering detailed instructions; carrying out detailed instructions; interacting appropriately with the general public; maintaining socially appropriate behavior; completing a normal workday without interruptions from psychologically based symptoms; performing at a consistent pace; and dealing with normal work stress. (R. at 387.)

### 3. Hearing Testimony

On October 14, 2014, Plaintiff, a medical expert (ME), and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 40-56.) Plaintiff was represented by an attorney. (R. at 42.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was 50 years old, divorced, and had one daughter. (R. at 42.) She explained that she had not worked since May 2013, because working caused "stress [that] was messing with [her] diabetes." (R. at 42-43.)

Plaintiff's primary problems were caused by her diabetes. (R. at 43.) She had diabetic retinopathy, and had two hip surgeries "because of the soft bones" and several hand and toe surgeries because of her diabetes. (R. at 43.) She also had a "fusion surgery" on two "bulged discs" sitting on a nerve in her neck. (R. at 44.) She could be on her feet for "maybe 15-20 minutes at a time" before having to sit down, and she took a nap between 11:00 a.m. and 12:00 p.m. every day. (R. at 44.) She cleaned her house once a week for "usually three hours but not all at the same time" because of pain in her neck and back. (R. at 44-45.) She had also been diagnosed with depression in 2011, but her prescribed medication "controlled it." (R. at 45-46.) She also had constant pain in her "neck, fingers, wrist, hips, [and] feet" that ranked as a "5-7" out of 10. (R. at 47.)

She would be unable to keep up with any of her prior work "[b]ecause of the stress and the fatigue, " and because she could not "remember things" or "think straight." (R. at 47-48.)

### b. *ME's Testimony*

The ME's testimony focused exclusively on Plaintiff's depressive disorder. (R. at 49-51.) He testified that he had reviewed Plaintiff's medical evidence of record and identified a diagnosis of "depressive disorder, NOS." (R. at 48.) He opined that Plaintiff's depression did not cause any restrictions of daily living or functional limitations; the "treating source [said] that her depression has responded to intervention, [and was] pretty controlled." (R. at 48-49.) The ME identified her depression as "reactive" in that it was a "direct physiological result of the physical problem" on her mood. (R. at 49-50.) He further opined that Plaintiff's depression was non-severe and would cause no mental restrictions on her RFC. (R. at 50.)

Plaintiff's attorney referenced Dr. Horton's psychological evaluation that indicated psychologically based mental symptoms and asked if those symptoms would cause significant mental limitations. (R. at 53-54.) The ME responded that Dr. Horton's evaluation showed "the mild depressive condition could be treated with cognitive behavior therapy," and it "would not cause the kind of erosion in functional capacity that [Plaintiff's attorney was] describing." (R. at 54.) Also, Plaintiff's "treating doctor [had] noted that she had improved with the medication, and that's what she described today." (R. at 55.)

### c. *VE's Testimony*

The VE testified that she had reviewed the vocational information in Plaintiff's file and determined that she had the following past relevant work experience: pharmacy technician, DOT 074.382-010 (SVP: 3). (R. at 51.)

The ALJ asked the VE to consider a hypothetical individual who had the same age, education, and work history as Plaintiff and also had the following restrictions: limited to the full range of medium work with no postural restrictions; able to lift 50 pounds occasionally and 25 pounds frequently; able to sit, stand, or walk for 6 hours out of an 8-hour work day; and no mental limitations. (R. at 51.) The VE testified that the hypothetical individual could perform all requirements of the job of pharmacy technician. (R. at 51.) The ALJ then asked the VE to add to that hypothetical individual the limitations of constant "fatigue and pain." (R. at 52.) The VE responded that this hypothetical individual would not be able to perform the requirements necessary of a pharmacy technician consistent with the DOT with the additional limitations. (R. at 52.)

Plaintiff's attorney then asked the VE to add to that hypothetical individual the limitation of "significant interruptions in the work day due to psychologically based symptoms." (R. at 52.) The VE testified that if the interruptions "happen[ed] very often," then this individual would not be able to maintain competitive employment. (R. at 52.)

## C. The ALJ's Findings

The ALJ issued his decision denying benefits on December 31, 2014. (R. at 9-32.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of May 8, 2013. (R. at 14.) At step two, the ALJ found that she had the following severe impairments: diabetes mellitus; degenerative disc disease; tendonitis; rotator cuff injury; and arthritis. (R. at 14.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (R. at 18-19.)

Next, the ALJ determined that Plaintiff retained the RFC to perform the following: lift and

carry 25 pounds frequently; lift and carry 50 pounds occasionally; sit, stand, and walk for 6 hours each in an 8-hour workday; and no mental limitations. (R. at 22.) At step four, the ALJ determined that Plaintiff was capable of performing her past relevant work of pharmacy clerk. (R. at 28.) Because he determined Plaintiff to be non-disabled at step four, the ALJ did not reach step five. (R. at 29.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from the alleged onset date of May 8, 2013, through the date of the decision (R. at 29.)

## II. LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759

F.2d 432, 435 n.1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *Id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.* at 436.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents three issues for review:

1. The ALJ Erred in Failing to Fully and Fairly Develop the Record.

2. The ALJ Erred to Properly Evaluate Plaintiff's Pain.

3. The ALJ Erred in Finding that Plaintiff's Mental Impairments are Not Severe.

(doc. 25 at 1.)

### A.   **Duty to Develop the Record**

Plaintiff first argues that the ALJ erred by failing to order additional consultative examinations. (doc. 25 at 4-5.)

An ALJ has a duty to fully and fairly develop the facts relative to a claim for benefits. *Newton v Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)). When the ALJ fails in this duty, he does not have before him sufficient facts upon which to make an informed decision, and his decision is not supported by substantial evidence. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) ("When a claimant is not represented by counsel, the ALJ owes a heightened duty to 'scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'"); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). For this reason, a reviewing court may reverse the ALJ's decision if the claimant can show that "(1) the ALJ failed to fulfill his duty to develop the record adequately and (2) that failure prejudiced the plaintiff." *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012).

"The decision to order a consultative examination is within the ALJ's bailiwick." *Harper v. Barnhart*, 176 F. App'x 562, 566 (5th Cir. 2006). An ALJ must order a consultative evaluation, however, when it is necessary to enable him to make the disability determination. *See Brock*, 84 F.3d at 728 (citing *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)). When evidence in the record supports a conclusion that the claimant is not disabled, a consultative exam is not necessary. *See Turner*, 563 F.2d at 671; *see also Pierre v. Sullivan*, 884 F.2d 799, 802-03 (5th Cir. 1989) ("The decision to require such an examination is within the discretion of the ALJ."). Additionally, the duty to develop the record can be effectuated by the ALJ's questioning of the claimant regarding her education, training, past work history, the circumstances of her injury, daily routine, pain, and physical limitations, and providing an opportunity to add anything else to the record. *See Sun v.*

*Colvin*, 793 F.3d 502, 509 (5th Cir. 2015) ("Consistent with that description, the court often focuses on the ALJ's questioning of the claimant in order to determine whether the ALJ gathered the information necessary to make a disability determination.") (citing *Brock*, 84 F.3d at 728).

Here, the ALJ considered a medical record that was over 200 pages long and included over 4 years of treatment notes from two of Plaintiff's primary care physicians; medical records from Plaintiff's emergency hospitalization and surgery; and 2 psychological evaluations from Drs. McCrary and Horton. (R. at 181-406.) The record also contained 2 different RFC assessments from non-examining consultants, as well as the hearing testimony from Plaintiff, the ME, and the VE. (R. at 40-56, 58-75.) Despite this record, the ALJ's decision noted that consultative examinations by a "pain specialist," a "physical therapist," and a "work evaluation" could have "provide[d] a comprehensive evaluation" of Plaintiff's problems and would have "clarif[ied] the full extent" of her restrictions. (R. at 15, 25-26, 28.) He did not order any of these consultative examinations, however, because they were "not available in this locale." (R. at 15, 26, 28.) The ALJ also explained that he found "no glaring flaws in [the SAMC's] medical review of the evidence," and that "[i]t is not necessary or feasible to order additional consultative examinations." (R. at 27.)

Plaintiff argues that the ALJ had a duty to order the three additional consultative examinations, and that he was "misinformed when he was advised that [these types of consultative examinations were] not available in [Plaintiff's] locale." (doc. 25 at 5.) She alleges that she conducted a "cursory review" on the Internet search engine "YAHOO" and received over 6,000 results for available pain centers in her locale. (*Id*. at 4-5.) She did not identify these consultative examiners or allege that any of them are sufficiently qualified or have given such an opinion in the past. (*See id*.) Plaintiff, in essence, contends that her "YAHOO" Internet search was more

"informed" than the ALJ about the availability of certain types of consultative examiners on an application for Social Security benefits.

An ALJ may properly decide not to order additional consultative examinations when they are unavailable. *See Freeman v. Berryhill*, No. 3:15-CV-3640-N, 2017 WL 1048127, at *7 (N.D. Tex. Feb. 13, 2017), *adopted by* 2017 WL 1036736 (N.D. Tex. Mar. 17, 2017) (affirming the ALJ's decision not to order an additional consultative examination after the ALJ determined that the particular "type of [consultative examination was] not currently available and thus it would be futile to request one"). There is, moreover, no indication that the medical records before the ALJ were inadequate, or that he lacked sufficient facts to make a determination. *See Pierre*, 884 F.2d at 802 ("The decision to require such an examination is within the discretion of the ALJ."). Even if certain aspects of Plaintiff's medical history were not included in the medical record, that information was further developed by the ALJ at the hearing. (R. 40-56.) Additionally, Plaintiff has not demonstrated how additional consultative examinations would have led to a more favorable decision, and she never submitted additional examinations as new evidence to the Appeals Council. The ALJ fulfilled his duty to fully and fairly develop the record. Remand is not warranted on this basis.

**B.     <u>Severity</u>**[4]

Plaintiff also argues that the ALJ erred by failing to find that her depression was a severe impairment.[5] (doc. 25 at 14.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity

---

[4]  The issues are addressed in sequential step order rather than the order in which they were presented.

[5]  Plaintiff also argues that "[i]t did not appear that the ALJ specifically makes a finding as to whether Plaintiff's mental impairments are severe" (doc. 25 at 11), but the ALJ explicitly found at step 2 that Plaintiff's "depression [did] not interfere with the ability to work and is therefore rated as 'non-severe.'" (R. at 15). Neither the Plaintiff nor the medical record identifies any other mental impairment besides her depression.

of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii),(c). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that a literal application of this regulation would be inconsistent with the Social Security Act because the regulation includes fewer conditions than indicated by the statute. *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985). Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id*. at 1101. In other words, "the claimant need only . . . make a *de minimis* showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n.5 (5th Cir. 1992) (citation omitted). When determining whether a claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient severity. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523). The claimant has the burden to establish that her impairments are severe. *See Bowen v. Yukert*, 482 U.S. 137, 146 n.5 (1987).

In his decision, the ALJ noted that the "record indicate[d] that [Plaintiff had] depression" but that her "depression screening responses demonstrated normal to mild depressive symptoms, which indicated the absence of an affective disorder." (R. at 16.) He further noted that Plaintiff's testimony at the hearing was consistent with the medical record on how her depression was "controlled" with

medication, and that she was "alert, oriented, and well groomed, exhibit[ing] normal speech, appropriate mood and affect, denied delusions, hallucination, and suicidal ideation." (R. at 16.) The ALJ then considered the mental status report from Dr. McCrary that "noted no functional limitations" due to any mental impairment, and he noted the ME's testimony from the hearing about how Plaintiff's depression was non-severe and caused no mental limitations. (R. at 16, 21.) He also noted that Dr. Horton's psychological evaluation was the only piece of medical evidence showing that Plaintiff had mental limitations due to her depression, including limitations to her ability to understand, remember, and carry out detailed instructions and her ability to complete a normal workday without interruptions from her psychologically based symptoms. (R. at 16-17.) Based upon all of the medical evidence and hearing testimony, the ALJ used the proper technique[6] to determine that her depression resulted in no episodes of decompensation and caused only "mild limitations" as to her functional areas of daily living, social functioning, and concentration, persistence, and pace. (R. at 21-22.) The ALJ ultimately agreed with the SAMC's determination that Plaintiff's depression was "non-severe" and did not interfere with her ability to work. (R. at 17.)

Plaintiff points to Dr. Horton's psychological assessment as evidence of the severity of her depression.[7] (doc. 25 at 14.) The ALJ, however, fully discussed how Dr. Horton's opinions on the limitations due to Plaintiff's depression were "not confirmed elsewhere in the record and [were] generally at odds with the original allegations," including Dr. McCrary's and Nurse Goodwin's treatment notes and Dr. McCrary's findings on her mental status report. (R. at 20.) He further noted

---

[6] The "special technique" for evaluating the severity of mental impairments is described in 20 C.F.R. § 404.1520a.

[7] Also in this section, Plaintiff argues that the ALJ erred in his credibility assessment, especially in regard to his agreement with the SAMC's opinions on Plaintiff's limitations. (doc. 25 at 12.) These arguments will be considered in the following issue.

how the "agency regards testing [such as Dr. Horton's] as less than reliable to the extent that the results are based on self-report." (R. at 20.) Plaintiff has not shown that her depression was a severe impairment, and substantial medical evidence instead supports the ALJ's finding that her depression did not interfere with her ability to perform work-related activities. *See Hammond v. Barnhart*, 124 F. App'x 847, 853 (5th Cir. 2005) (holding that, even though there was "some evidence that point[ed] to a conclusion that differ[ed] from that adopted by the ALJ," there was no error because there was "far more than a scintilla of evidence in the record that could justify [the] finding that [the plaintiff's] impairments were not severe disabilities"); *see also Sweeney v. Astrue*, 796 F. Supp. 2d 827, 833-34 (N.D. Tex. 2011) (finding no error when the ALJ determined an impairment to be non-severe when the ALJ's decision stated that he "consider[ed] all the evidence" and the plaintiff failed to point out anything "that would cause the court to doubt the truthfulness of those statements"). The ALJ did not err by finding Plaintiff's depression to be non-severe, and remand is not required on this basis.

## C.     Subjective Complaints

Plaintiff argues that the ALJ failed to properly evaluate her subjective complaints of chronic pain. (doc. 25 at 7.)

When the ALJ issued his decision, Social Security Ruling: SSR 96–7p required him to follow a two-step process for evaluating a claimant's subjective complaints. SSR 96–7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). First, the ALJ must consider whether the claimant had a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id*. Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability

to do basic work activities. *Id.* If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements. *Id.*; *see Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

The ALJ's credibility determination must be based on a consideration of the entire record, including medical signs and laboratory findings, and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effect. *See* SSR 96–7p, 1996 WL 374186 at *2. The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements:

> 1. the claimant's daily activities;
>
> 2. the location, duration, frequency, and intensity of pain or other symptoms;
>
> 3. factors that precipitate and aggravate symptoms;
>
> 4. the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms;
>
> 5. treatment, other than medication, for relief of pain or other symptoms;
>
> 6. measures other than treatment the claimant uses to relieve pain or other symptoms (*e.g.*, lying flat on his or her back);
>
> 7. and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. *Id.* at *3.

Although the ALJ must give specific reasons for his credibility determination, "neither the regulation nor interpretive case law requires that an ALJ name, enumerate, and discuss each factor in outline or other rigid, mechanical form. It suffices when the administrative decision is sufficiently specific to make clear that the regulatory factors were considered." *Prince v. Barnhart*, 418 F. Supp.

2d 863, 871 (E.D. Tex. 2005). Moreover, the Fifth Circuit has explicitly rejected the requirement

that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints. *Falco*,

27 F.3d at 164. The ALJ's evaluation of the credibility of subjective complaints is entitled to

judicial deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best

position to assess a claimant's credibility, since he "enjoys the benefit of perceiving first-hand the

claimant at the hearing." *Falco*, 27 F.3d at 164 n.18.

In his decision, the ALJ identified Plaintiff's complaints of chronic pain, and after reviewing

the medical record, determined that her "symptoms of chronic pain do not fulfill the legal definition

of a 'medically determinable impairment'" because there were "simply insufficient signs and

laboratory findings in this record" as to her complaints. (R. at 15-17.) The ALJ's analysis noted that

Dr. Horton identified a "significant psychological contribution to [the Plaintiff's] degree of

symptomatology." (R. at 20.) It evaluated and disregarded Dr. Horton's "aggregate effect theory"

on Plaintiff's pain because it was "not confirmed elsewhere in the record and is generally at odds

with the original allegations, which treat the impairments as discrete phenomena." (R. at 20.) The

ALJ ultimately agreed with the SAMCs that Plaintiff's "chronic pain could not be produced by any

of the impairments identified in the record and was therefore disproportionate to medical

expectations." (R. at 17.) Using the seven factors, he additionally found that Plaintiff "appear[ed]

to be independent in self-care and instrumental activities of daily living [with] reports [of] few

deficits in these areas." (R. at 24.) He determined that Plaintiff "clearly perceive[d] herself to be

disabled," but she was not "wholly credible." (R. at 25.)

### 1.    *SSR 16-3p*

Plaintiff first contends that this case must be remanded because the ALJ conducted a

credibility assessment under SSR 96-7p, which is inconsistent with the newly enacted SSR 16-3p. (doc. 25 at 7-9.)

Effective March 28, 2016, the Social Security Administration eliminated "use of the term 'credibility' from [its] sub-regulatory policy," stating "that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2016 WL 1020935, at *1 (S.S.A. Mar. 16, 2016). Under SSR 16-3p, an ALJ:

> will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities. *Id.* at *10.

Plaintiff argues that this new regulation applies retroactively and that this case must be remanded for the ALJ to apply the proper analysis. (doc. 25 at 7-9) (citing *Mendenhall v. Colvin*, No. 3:14-CV-3389, 2016 WL 4250214 (C.D. Ill. Aug. 10, 2016)). Absent explicit language to the contrary, administrative rules do not ordinarily apply retroactively. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 298 (1988) ("Retroactivity is not favored in the law"). For SSR 16-3p, the Commissioner provided March 28, 2016, as the effective date, which is more than a year after the ALJ's decision in this case. *See* 81 Fed. Reg. 15776-01, 2016 WL 1131509. The Fifth Circuit Court of Appeals has not yet addressed this issue, but several district courts in the Fifth Circuit have determined that SSR 16-3p is not retroactive. *See, e.g., McDonald v. Berryhill*, No. 3:16-CV-1527-BF, 2017 WL 4124282, at *4 (N.D. Tex. Sept. 15, 2017); *Richardson v. Colvin*, No. 4:15-CV-0879-BL, 2017 WL 237637, at *16 n.12 (N.D. Tex. Jan. 17, 2017); *Mayberry v. Colvin*, No. G-15-330, 2016 WL 7686850, at *4-*5 (S.D. Tex. Nov. 28, 2016). Consistent with the findings

from the other courts in the Fifth Circuit, it appears that SSR 16-3p does not apply retroactively because it does not indicate the SSA's intent to apply it retroactively.

Even if SSR 16-3p did apply retroactively, the outcome would not differ in this case because "it is evident that the change brought about by SSR 16-3p was mostly semantic." *Howard v. Berryhill*, No. 3:16-CV-318-BN, 2017 WL 551666, at *7 (N.D. Tex. Feb. 10, 2017) (collecting cases). SSR 16-3p instructs ALJs to determine "the extent to which . . . symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the [claimant's] record" and simply shifts the focus from a more general analysis of a claimant's truthfulness to an objective comparison of a claimant's statements to the evidence of record. *See id.* at *6. The ALJ did not use the word "credibility" to impugn Plaintiff's character or imply that she was untruthful, but rather, as a "reference to the inconsistencies between Plaintiff's subjective complaints and the objective evidence in the record." *See Alvarez v. Colvin*, No. 4:16-CV-00432, 2017 WL 2712872, at *7 (S.D. Tex. June 22, 2017). He did not base his determination on an unsupported assessment of Plaintiff's truthfulness or character. *See id.* (finding that "it was not error for the ALJ to use the term 'credibility' in his decision" when the ALJ's "subjective complaint determination [was not based] on a bare and unsupported assessment of [the plaintiff's] truthfulness"). The ALJ did not err by conducting a credibility assessment, and remand is not warranted on this basis.

### 2.    *Credibility Analysis*

Plaintiff next contends that the ALJ's credibility analysis was flawed because he relied upon the assessments from the SAMCs and failed to "investigate the possibility that mental impairment

is the basis of [her] symptoms" of pain.[8] (doc. 25 at 9-11.)

In his decision, the ALJ did consider the "psychological contribution to [Plaintiff's] degree of symptomatology" of chronic pain when analyzing Dr. Horton's psychological evaluation. (R. at 20.) He noted Dr. Horton's "aggregate theory" on how Plaintiff's mental impairments could cause an increase in her reports of chronic pain, but disregarded this theory because it was "not confirmed elsewhere in the record and is generally at odds with the original allegations, which treat the impairments as discrete phenomena," as identified in Dr. McCrary's and Nurse Goodwin's treating medical records and evaluations. (R. at 20.) He further assigned "substantial weight" to the credibility assessments of the SAMCs because Plaintiff's "assertions of limitations made in the application very closely track the testimony at the hearing." (R. at 25.) The ALJ properly discredited Plaintiff's subjective complaints of pain, and substantial evidence supports his decision. *See Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991) (noting that it is appropriate for an ALJ to discredit a claimant's subjective complaints due to contradictory medical reports or daily activities). Remand is not warranted on this basis.

### IV. CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** this 28th day of September, 2017.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[8] In this section, Plaintiff repeats her argument that the ALJ erred in "not properly developing the record when he [had] acknowledged that [a consultative examination by a pain specialist] would help him to properly assess the effects of Plaintiff's pain." (doc. 25 at 11.) As discussed in the first issue, the ALJ did not err in failing to develop the record, and remand is not required on that basis.

23